UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|   |   |
|---|---|
| IN RE APPLICATION OF THE ) <br> UNITED STATES OF AMERICA FOR ) <br> AN ORDER PURSUANT TO ) <br> 18 U.S.C. § 2703(d) ) <br> ) | Case No. 24-mc- <br><br> **Filed Under Seal** |

# APPLICATION OF THE UNITED STATES
# FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require the Microsoft Corporation ("Microsoft"), an email provider headquartered at 1 Microsoft Way, Redmond, Washington, to disclose certain records and other information pertaining to the following Microsoft email accounts executive@gcso.net ("Subject Account 1"), credentialing@gcso.net ("Subject Account 2") muhamed@gcso.net (Subject Account 3), slips@gcso.net ("Subject Account 4"), and hermespaknship@outlook.com ("Subject Account 5"), (together, the "Subject Accounts"). The records and other information to be disclosed are described in Part I of Attachment A to the proposed Order. In support of this application, the United States asserts:

## LEGAL BACKGROUND

1.  Microsoft is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Specifically, Microsoft offers to the public through its Microsoft account a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Accordingly, the United States

may use a court order issued under § 2703(d) to require Microsoft to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

THE RELEVANT FACTS

4. The United States is investigating potential fraud related to health care benefit programs, including Medicare. The investigation concerns possible violations of, *inter alia*, 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy), 18 U.S.C. 1957 (money laundering), and 42 U.S.C. § 1320a-7b(b) (payment or receipt of kickbacks).

5. This application pertains to an investigation of Advanced Medical Supply Corp ("Advanced"), a New Hampshire based durable medical equipment ("DME") supplier currently owned and/or controlled by Leo Anzivino ("Anzivino"), an apparent resident of Massachusetts. This investigation also pertains to Dimon Business Solution LLC ("Dimon"), a Florida

corporation based in St. Petersburg, Florida, which according to publicly available corporate records from the Florida Secretary of State was incorporated by Christopher Spellman ("Spellman") on October 23, 2023, and his title is listed as Manager and Registered Agent. Lastly, the investigation pertains to Hermes Pak n Ship LLC ("Hermes"), an apparent DME supplier located in Covington, Georgia, which according to publicly available corporate records from the Georgia Secretary of State was incorporated by Jonathan Quiles ("Quiles") on October 16, 2023, and his title is Organizer.

6. Investigators are trying to determine the full scope of the scheme and the allegations under investigation relate to a scheme to submit false and fraudulent claims to Medicare and other Federal health care programs for: (a) DME that was not medically necessary; (b) DME that was not eligible for reimbursement; (c) DME not provided as represented; and (d) claims tainted by illegal kickbacks. Investigators believe this scheme was perpetrated through the use of telemedicine.

7. Telemedicine provides a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient. Telemedicine companies provide telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically pay doctors a fee to conduct consultations with patients.

8. Orthotic devices, or orthoses, are DME items that are applied to the outside of the body to support a body part. They are commonly referred to as "braces." Examples of orthotic devices include back braces, knee braces, ankle braces, wrist/hand supports, and arm/shoulder supports.

9. According to a July 20, 2022, Special Fraud Alert from the Department of Health and Human Services – Office of Inspector General, a common health care fraud scheme in the DME industry exists where a telemedicine company pays physicians illegal kickbacks to generate doctors' orders for medically unnecessary DME resulting in the submission of false and fraudulent claims to Medicare and other Federal health care programs.[1] The alert states that in many of these arrangements, telemedicine companies pay practitioners in exchange for ordering or prescribing items or services: (1) for purported patients with whom the practitioners have limited, if any, interaction; and (2) without regard to medical necessity. Additionally, these fraud schemes vary in design and operation, and they have involved a wide range of different individuals and types of entities, including international and domestic telemarketing call centers, staffing companies, practitioners, marketers, brokers, and others.

10. Advanced is a DME supplier located in Rochester, New Hampshire, formerly owned and operated by Lucas Bonenfant ("Bonenfant").

11. According to Medicare records, Advanced has been a Medicare enrolled provider since on or about October 4, 2023. A bank account at Meredith Village Savings Bank ("MVSB") is identified as Advanced's account for electronic payments from Medicare.

12. MVSB records demonstrate that on December 18, 2023, Bonenfant sold Advanced to Anzivino. For example, on that day Bonenfant received a wire to a personal account at the bank in the amount of $82,500 from Dimon. That same day, Anzivino became the sole signatory on the Advanced account at MVSB, replacing Bonenfant. A corporate resolution for Advanced, also dated December 18, 2023, was filed with MVSB and listed Anzivino as the manager of the company. MVSB records document that Anzivino also has a personal account at MVSB, and his contact email address is listed as lanzivinojr921@gmail.com.

---

[1] https://oig.hhs.gov/documents/root/1045/sfa-telefraud.pdf (last viewed June 6, 2023).

4

13. Publicly available corporate records from the NH SOS dated December 18, 2023, indicate that Anzivino replaced Bonenfant as the President and Director of Advanced.

14. Medicare claims data reflects that Advanced began submitting claims to Medicare in January 2024. More specifically, from January 2, 2024, to February 19, 2024, Advanced billed Medicare Part B approximately $6,357,081.04 and was paid approximately $2,975,778.16 in connection with claims for DME purportedly provided to more than 1,835 Medicare beneficiaries.[2] From January 16, 2024, to March 16, 2024, Medicare received approximately 131 complaints from Medicare beneficiaries about Advanced, including allegations that Medicare was billed for services not rendered, that beneficiaries did not know the provider purportedly referring the DME to them, and suspected identity theft.

15. An investigator has interviewed a number of Medicare beneficiaries who complained to Medicare who have generally reported that they received braces in the mail, that they didn't want and/or need, and did not know the referring provider for the braces.

16. For example, on February 21, 2024, an investigator interviewed Medicare beneficiary C.J., a resident of California, who reported that he/she received several phone calls from people with foreign accents offering free braces. The callers knew so much about C.J.'s previous health history, he/she thought they were from Medicare. C.J. did not know how the callers knew the information. After the call, C.J. received a back brace, two knee braces, and two knee suspension sleeves in the mail. C.J. stated that he/she is not being treated by Dr. Allyson Estess. C.J. does not need the braces for any medical conditions. In response, C.J. sent his/her doctor an email stating that C.J. did not need or approve these braces. C.J. subsequently filed a complaint with Medicare about the braces because C.J. thought this was a "scam" and that the government was paying for things he/she does not need.

---

[2] The data is up to date as of March 20, 2024.

17. Medicare claims data indicates Advanced billed Medicare for providing C.J. with a back brace (L0650), left and right knee braces (L1851) and left and right knee suspension sleeves (L2397) on January 8, 2024. Medicare was billed approximately $3,671.22 for the braces and paid approximately $1,038.09 to Advanced in connection with claims. The claims list the referring provider as Allyson Estess.

18. Likewise, according to Medicare claims data as of March 20, 2024, Dr. Alexis Colvin of New York is the top referring provider for Advanced. The claims data indicates that from January 15, 2024 to February 19, 2024, Dr. Colvin has referred more than 230 Medicare beneficiaries to Advanced for DME, resulting in Advanced billing Medicare approximately $860,953.28, and Medicare paying Advanced approximately $397,145.86.

19. Dr. Colvin was interviewed on April 16, 2024, and in summary stated that she had never heard of Advanced until February 1, 2024, when her secretary told her that she had received telephone calls at work from approximately three individuals complaining that they had received braces from Advanced allegedly prescribed by Colvin, and the individuals did not want the braces. Dr. Colvin confirmed that the individuals that had called and complained were not Dr. Colvin's patients. Dr. Colvin estimated that she has been made aware of approximately 15 individuals calling her work complaining about receiving braces from Advanced allegedly prescribed by Dr. Colvin for braces they did not want.

20. Dr. Colvin found it "shocking" that according to the Medicare claims data she is the top referring provider of DME for Advanced. She explained that she rarely prescribes braces and when she does, they are mostly braces related to post-ACL surgery and shoulder slings. Dr. Colvin explained that she would not use a DME supplier located outside of New York to prescribe braces to her patients at Mt. Sinai. Dr. Colvin expressed much concern about the use

of her National Provider Identification ("NPI") number in connection with billings from Advanced to Medicare for DME that she did not prescribe.

21.     Pursuant to a grand jury subpoena, MVSB produced notes of conversations that a bank employee had with Anzivino from February 13, 2024, to February 20, 2024. Generally, the conversations related to Anzivino's efforts to wire more than $1 million in funds from the Advanced account to external accounts, including a wire for $680,430.40 to Dimon and $350,000 to Hermes. According to the notes, on February 13, 2024, when asked about the recent activity in the account, Anzivino stated that it took him time to get certifications in place and billing had started to come through [for the company]. The MVSB employee asked Anzivino about Dimon, and Anzivino responded that Dimon is his "business manager and the brains behind all of this." Anzivino explained that he has been associated with Dimon for over a year and they "run everything." Later that day, the MVSB employee told Anzivino that the bank was still not confident that the companies that Anzivino was trying to wire funds to, Dimon and Hermes, were legitimate and denied the wires. Anzivino told the employee his contact at Dimon was Spellman, and Quiles was his contact at Hermes.

22.     Later that afternoon, the bank employee received an email from Anzivino sent from lanzivinojr921@gmail.com that contained an attachment of a purported contract dated January 3, 2024, between Advanced and Dimon. The contract identifies Advanced as a DME business based in Rochester, New Hampshire and reflects that the day-to-day management of Advanced is delegated to Dimon, including that Dimon "shall organize and supervise all billing and collection services on behalf of [Advanced]" and "shall manage billing staff who shall prepare and submit claims" and "input billing information." Dimon is also responsible for "respond[ing] to inquiries from patients and payors concerning their bills" and for "arranging for

7

third parties to provide advertising and marketing services" on behalf of Advanced. The contract goes on to identify the email account for Dimon as Subject Account 1 and for Advanced as lanzivinojr921@gmail.com. The contract lists Spellman as the owner of Dimon b/b/a "Global Consulting Solutions and Outsourcing," and Anzivino as the President of Advanced.

23. MVSB also produced another email from Anzivino sent from lanzivinojr921@gmail.com to the bank employee dated February 13, 2024, that contained an apparent contract dated January 3, 2024, between Advanced and Hermes. This contract identifies Hermes as, "a company with necessary expertise and resources to provide or arrange for certain storage and distribution of various goods" and identifies that Hermes will provide warehousing, handling, procurement, distribution, and related ancillary services for Advanced. The contract identifies Quiles as the owner of Hermes, and Anzivino as the Manager of Advanced.

24. On March 1, 2024, the United States obtained a court order under 18 U.S.C. § 2703(d) in the District of New Hampshire (case no. 24-mc-16-TSM) directing Google to produce records related to lanzivinojr921@gmail.com for the period January 1, 2023, to March 1, 2024. The Government received a response from Google on March 18, 2024.

25. The records from Google produced pursuant to the §2703(d) order show that lanzivinojr921@gmail.com was used to communicate with Subject Account 1. The records also show that there was communication with other email accounts ending with the same domain as Spellman's email, "@gcso.net", an apparent abbreviation for Dimon d/b/a "Global Consulting Solutions and Outsourcing." Specifically, lanzivinojr921@gmail.com was used to communicate with Subject Account 2, Subject Account 3, and Subject Account 4. The Google records also demonstrate that lanzivinojr921@gmail.com was used to communicate with

hermespaknship@outlook.com ("Subject Account 5").  A more detailed summary is provided in the following table:

| Email Account | Start Date | End Date | Approx. # of Emails Exchanged |
|---|---|---|---|
| Subject Account 1 | 11/13/23 | 2/20/24 | More than 25 |
| Subject Account 2 | 12/20/23 | 2/29/24 | More than 35 |
| Subject Account 3 | 12/18/23 | 1/2/24 | 5 |
| Subject Account 4 | 1/2/24 | 2/20/24 | More than 30 |
| Subject Account 5 | 1/2/24 | 2/20/24 | More than 50 |

26.     The Google records demonstrate that there were numerous emails either sent to or from lanzivinojr921@gmail.com, where a number of the above relevant email accounts were also copied on the same email.  For example, on January 5, 2024, an email was sent from another email account to lanzivinojr921@gmail.com and Subject Account 4.  Likewise, on February 20, 2024, lanzivinojr921@gmail.com and Subject Account 4 received an email from Subject Account 5**.**

27.     I am aware of the website http://mxtoolbox.com, which can be used to determine an email service provider for an email account.  According to this website, the email service provider for the domain "@gcso.net", the domain in Subject Accounts 1-4, is Microsoft.[3]

28.     I know that GoDaddy.com, LLC ("GoDaddy") is a domain hosting registrar that allows customers to create and obtain a domain.  Furthermore, according to GoDaddy's website, it offers customers email access through Microsoft 365.[4]  According to records obtained from GoDaddy via grand jury subpoena the domain "@gcso.net" is registered with GoDaddy.  The

---

[3] Last viewed on April 26, 2024.
[4] https://www.godaddy.com/email (last viewed 4/26/24).

9

records reflect that Subject Accounts 1-4 have Microsoft 365 Online Business Essentials.

29. I also know that Microsoft provides a variety of on-line services, including email access to the public. Microsoft allows subscribers to obtain email accounts at the domain "@outlook.com", like the domain in Subject Account 5.

30. Information regarding any communications between the Subject Accounts and other email accounts, including those associated with Advanced, Dimon, Hermes. and others are relevant to the Government's investigation.

### *Conclusion*

31. Based on the investigation, Advanced, Dimon, and Hermes, and their principals are targeting federal healthcare beneficiaries and ultimately providing them with unwanted and/or unnecessary braces. Any communications by the Subject Accounts with any other individual or entity in furtherance of the scheme is relevant to the government's investigation.

32. Based on the above, it is reasonable to believe that the requested records of non-content information for the Subject Accounts is relevant to the government's investigation as such records contained in the Subject Accounts may provide evidence of participation in a healthcare fraud and/or money laundering scheme during the relevant period. Such records may also provide evidence of communications between the principals of Advanced, Dimon, Hermes, and others which may assist in the identification of any co-conspirators also involved in the offenses. Obtaining the IP addresses to the Subject Accounts for the same will also assist investigators in determining and locating the known actors involved in the scheme.

### REQUEST FOR ORDER

33. The facts set forth in the previous section show that there are reasonable grounds

to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Microsoft be directed to produce all items described in Part II of Attachment A to the proposed Order.

34. The United States further requests that the Order require Microsoft not to notify any person, including the subscribers or customers of the account(s) listed in Part I of Attachment A, of the existence of the Order for a time period of one year. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the attached court order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Such premature notification would permit those targets to destroy records before the government can obtain them through legal process. Accordingly, there is reason to believe that notification of the existence of the attached court order will seriously jeopardize the investigation or unduly delay a trial for that reason.

35. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

                                      Respectfully submitted,

                                      JANE E. YOUNG
                                      UNITED STATES ATTORNEY

Dated: May 3, 2024                    */s/ Geoffrey W.R. Ward*
                                      Geoffrey W.R. Ward
                                      Assistant United States Attorney
                                      N.H. Bar ID: 18367
                                      53 Pleasant Street, 4th Floor
                                      Concord, New Hampshire 03301
                                      geoffrey.ward@usdoj.gov
                                      (603) 225-1552

# ATTACHMENT A

## I.  The Account(s)

The Order applies to certain records and information associated with the following email accounts from November 13, 2023 to the present:

- executive@gcso.net;
- credentialing@gcso.net;
- muhamed@gcso.net;
- slips@gcso.net;
- hermespaknship@outlook.com.

## II.  Records and Other Information to Be Disclosed

Microsoft is required to disclose the following records and other information, if available, to the United States for each account or identifier listed in Part I of this Attachment, for the time-period reflected above, regardless of whether such information is located within or outside of the United States:

    A.    The following information about the customers or subscribers of the Account:

1. Names (including subscriber names, user-names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
3. Local and long-distance telephone connection records (including records of text messages sent and received);
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
5. Length of service (including start date) and types of service utilized;
6. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

       7.       Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.       All records and other information (not including the contents of communications) relating to the Account, including:

       1.       Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user-names; and source and destination Internet Protocol addresses; and

       2.       Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers).

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this Order.